# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| NANCY LEE BAILEY, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 14-10141-DJC** |
| ) | |
| PRICEWATERHOUSECOOPERS, LLP and ) | |
| SEAN ANGLES, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          **November 18, 2015**

## I.     Introduction

Plaintiff Nancy Lee Bailey ("Bailey") has filed this lawsuit against Defendants PricewaterhouseCoopers LLP ("PwC") and Sean Angles (collectively, "Defendants") alleging that Bailey was fired from PwC in retaliation for her report of sexual harassment of a co-worker by a manager in violation of 42 U.S.C. § 2000e-2(a)(1) *et seq.* and Mass. Gen. L. c. 151B § 4 and because of her age in violation of 29 U.S.C. § 623(a) and Mass. Gen. L. c. 151B § 4.  D. 1. Defendants have moved for summary judgment.  D. 33.  For the reasons stated below, the Court **ALLOWS** the motion.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect

the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless

Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the

absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.

2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant bears the burden of

demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124,

132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its

burden, the non-moving party may not rest on the allegations or denials in her pleadings,

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue

on which she would bear the burden of proof at trial, demonstrate that a trier of fact could

reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d

1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is

'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The

Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable

inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

### A.    Independent Foreclosure Review Projects

Bailey was hired by PwC as a switchboard operator in 1995.  D. 53 ¶ 15.  During her first

ten years at PwC, she worked as a hotel administrator, receptionist and executive assistant.  Id.

¶¶ 16-18.  In 2005, Bailey became an associate in the Capital Markets group supervised by PwC

principal Scott Dillman.  Id. ¶¶ 22-23.

PwC employees who are not assigned to a billable project are considered "on the bench."

Id. ¶ 4.  It is not uncommon for PwC employees to be on the bench between assignments.  D. 54

¶ 31.  In 2010, Bailey was on the bench after she completed a project for Wells Fargo.  Id.  ¶ 28.

When Bailey reported to her PwC "coach" Regina Aries that she did not have a project, Aries told her that the PwC Human Resources department and the employee's coach find the employee a new work assignment.  Id. ¶¶ 29-30.  During her time on the bench in 2010, Bailey performed work for various PwC partners but did not bill for any hours she worked.  Id. ¶¶ 33-35.

Bailey was rated "Below Expectations" in a 2010 mid-year review and was given the lowest Annual Review Committee ("ARC") rating of 4 or "Less Than Expected" for the full year.  D. 53 ¶¶ 26-27.  She received this rating because she had lower than expected billable hours and not as a reflection of the quality of her work.  D. 54 ¶¶ 38-41.

In 2011, Bailey was trained for an Independent Foreclosure Review ("IFR") project for which PwC had been retained to review banks' mortgage foreclosure files.  D. 53 ¶¶ 28-29.  The review teams were generally composed of three layers.  "Preparers," the most junior employees, would review the banks' files, identify key documents and insert responses into a form questionnaire, and "reviewers" would review the preparers' work, either returning the file to the preparer for corrections or passing it on to the third level of review, the "approvers."  Id. ¶ 30. At least when working with supervisor James Dunn, Bailey was assigned to the middle level of this process as a "reviewer."  Id. ¶¶ 30-31.

Bailey's first IFR project in 2011 was based in Minnesota, where Dunn rated her as "meeting expectations."  Id. ¶ 32.  Dunn noted that Bailey's team was less productive than others and recommended that Bailey improve by communicating productivity problems to her manager. Id.  Dunn also noted that he was impressed by Bailey's mastery of the foreclosure and file review process.  D. 36-9 at 2.

Bailey next moved to an IFR project in North Carolina that required review of foreclosure files for compliance with certain state laws.  D. 53 ¶ 34.  She was initially supervised

by Karen Brown who rated Bailey as having "met expectations."  Id. ¶ 35.  Starting in the fall of

2011, Bailey began reporting to Donna Tassone on the same IFR project.  Id. ¶ 37.  In March

2012, Tassone rated Bailey as meeting expectations.  Id. ¶ 38.  Tassone noted in her review that

Bailey could improve her work by preventing the need for frantic and stressful work before

deadlines, improving her skills with spreadsheets and soliciting input from her supervisors.  Id.

The preparers who worked under Bailey on this IFR project noted concerns with her

performance.  Erica Green, a preparer, observed that Bailey did not have the skills expected of a

reviewer.  D. 41 ¶¶ 7-9.  According to Green, Bailey was not able to respond to questions from

attorneys at meetings, so Green attended attorney meetings with Bailey and took responsibility

for answering questions.[1]  Id. ¶ 8.  When confronted with time-sensitive information requests

from Tassone, Bailey would simply pass the requests along to the preparers.  Id. ¶ 9.  Brandon

Salese, another preparer, found that Bailey often could not answer his questions about the review

and that Bailey returned files with fewer substantive corrections than other reviewers.  D. 40 ¶¶

7-11.

In March 2012, while Bailey was on vacation for two weeks, Tassone performed Bailey's

work as a reviewer.  D. 54 ¶ 80.  After performing this work herself and communicating directly

with the preparers, Tassone concluded that Bailey's work was not meeting expectations.[2]  D. 42

---

[1] Bailey has moved to strike as conclusory the paragraph of Green's declaration that discusses Bailey's performance at attorney meetings, which both attended, on the grounds that Green fails to specify the number of attorney meetings that occurred or the nature of the questions Bailey failed to answer.  D. 49 at 1.  The motion is denied as this challenge goes to the weight, not admissibility, of such evidence at trial and the Court may consider admissible evidence in resolving this motion.

[2] Bailey has moved to strike as conclusory the paragraphs of Tassone's declaration that address Bailey's failure to provide guidance to preparers, Tassone's verbal coaching and constructive feedback to Bailey and Bailey's inability to respond to questions posed by Tassone about loans.  D. 51 at 1-2.  Bailey objects to the lack of detail provided by Tassone as to exactly what guidance Bailey failed to give preparers, what feedback Tassone gave to Bailey and what

¶ 8.  Tassone gave Bailey constructive feedback on her work, but Tassone reported that Bailey's performance did not improve and Bailey's preparers were not receiving sufficient instruction and direction.  Id. ¶¶ 9-11.  Bailey's engagement on the project was scheduled to end on June 22, 2012, and Tassone gave Bailey the choice of leaving the project or continuing as a preparer.  D. 53 ¶¶ 43-44.  Bailey elected to leave the project.  Id. ¶ 45.

On July 7, 2012, Bailey was assigned to an IFR project in Florida.  Id. ¶ 48.  Due to Bailey's continued performance issues, at the end of the summer Aaron Peloquin, who oversaw the project, assigned Bailey to work with Angles as her approver because Angles was known as an effective trainer for underperformers.  Id. ¶¶ 51, 53.  As a reviewer, Bailey supervised three preparers, including Jonathan Recor.  Id. ¶ 54.

### B.    Bailey Reports Recor's Allegation of Sexual Harassment

As later discussed, the crux of Bailey's retaliation claim is that Angles gave her a poor performance review because she reported Recor's allegations that Angles had made sexual advances.  Whether Angles was informed of Bailey's report of same remains, after discovery, unsupported by the record.

On September 25, 2012, Recor told Bailey that Angles had made what Recor interpreted as sexual advances to him and that Angles was being overly critical of Recor's job performance because he had declined those advances.  Id. ¶ 57.  The next day, Bailey and Recor met with Angles to discuss problems with Recor's performance, but the sexual allegations were not discussed.  Id. ¶¶ 60-61.  At this meeting, as Recor's supervisor, Bailey took responsibility for not scrutinizing Recor's work more carefully.  D. 36-1 at 86; D. 36-14 at 3.

and how many questions Bailey failed to answer.  The motion is denied as, again, this challenge goes to the weight, not the admissibility, of such evidence at trial.

A few days later, Bailey reported Recor's allegations to Aries.  D. 54 ¶ 149.  Aries told her to tell Dillman.  Id. ¶ 149.  Dillman was Bailey's "relationship partner" at PwC and, therefore, provided counseling and played a role in the review process.  Id. ¶ 150.

During the week of October 1, 2012, Bailey told Colleen Hurley, a manager at the same level as Angles, about Recor's allegations.  D. 53 ¶ 64.  Hurley was conflicted about whether Bailey should tell Angles about the allegations and Hurley promised to keep their conversation confidential.  Id.

On October 5, 2012, Bailey reported Recor's allegations to Dillman.  Id. ¶ 65.  Dillman testified that did not repeat the allegations, or the fact that Bailey reported them to him, to anyone else.  Id. ¶ 66; D. 36-4 at 14-16.

On October 8, 2012, Peloquin, Bailey and Recor met so Recor could tell Peloquin about Angles' sexual advances.  D. 54 ¶ 157.  At the meeting, Bailey told Peloquin that she had informed Dillman of Recor's allegations.  Id. ¶ 159.  Later that day, Peloquin contacted Gae Barbano-Grinder in Human Resources and reported Recor's allegations.  D. 53 ¶ 69.  Barbano-Grinder opened an investigation and Recor was immediately assigned to a different team where he would not report to Angles.[3]  Id. ¶¶ 70, 74.  The investigation ultimately concluded that the allegations were unsubstantiated.  Id. ¶ 78.

### C.    Bailey Leaves the IFR Project and Returns to the Bench

---

[3] Bailey has moved to strike various paragraphs of Barbano-Grinder's declaration as inadmissible or conclusory.  D. 50.  The motion is denied.  Contrary to Bailey's argument, Barbano-Grinder's statement that it was "brought to her attention" in summer 2012 that Recor and Bailey were not meeting expectations, see D. 43 ¶ 33 is admissible at least to explain why Barbano-Grinder assigned Bailey to work under Angles.  Second, Bailey moves to strike that statement and six others on the basis that the statements lack sufficient detail or explanation.  These arguments fail because the challenged statements are based on Barbano-Grinder's personal knowledge and Bailey's objections go to the weight, not admissibility, of the statements.

After working from home for a week, Angles returned to the Florida office on October 15, 2012, and complained about problems with Bailey's performance on the IFR project.  D. 54 ¶¶ 162, 180.  Other approvers also noted problems with Bailey's performance.  One approver, Diane Thai, reported to Peloquin on October 24, 2012 that 16 of 19 files reviewed by Bailey contained errors that should have been resolved before the file reached an approver.  D. 53 ¶ 75; D. 36-16.

Peloquin assigned a selection of Bailey's files to Thai and four other approvers to conduct independent reviews of Bailey's performance to confirm that others agreed with Angles that Bailey's performance was not meeting expectations.  D. 53 ¶ 76.  Each approver reported to Peloquin that he or she had identified errors in Bailey's work.  Id. ¶ 77; D. 36-18.  These errors included inconsistencies, typos, incorrect answers and formatting problems.  D. 36-18 at 2-3.

Peloquin spoke to Barbano-Grinder and took Bailey off the IFR project because of her performance problems.  D. 53 ¶¶ 80-81.  On November 12, 2012, Peloquin notified the approvers and reviewers on the IFR that the review was moving to a two-level rather than a three-level process.  Id. ¶ 79.  This change meant that after a preparer completed a foreclosure file, the file would be reviewed only one more time, by a reviewer or an approver.  Id.  Bailey was removed from the project on November 28, 2012.  Id. ¶ 81.  The change to a two-level review was implemented in January 2013 and multiple reviewers were rolled off the IFR project as a result of this restructuring.  Id. ¶ 79.  According to Peloquin, if Bailey had still been on the IFR at the time of the restructuring, she would been rolled off at that time.  D. 36-3 at 24.  However, Peloquin was unwilling to keep Bailey on the project until the restructuring due to her poor performance.  Id.

In December 2012, Angles completed a written performance review finding Bailey's work on the IFR to be "Below Expectations."  D. 53 ¶ 82.  Peloquin, as a secondary reviewer, noted in the review that problems with Bailey's work had been identified by Angles and other approvers.  Id. ¶ 83.  These problems included inconsistencies in Bailey's responses to issues in the file, missed documentation and lack of attention to detail.  Id.

After Bailey was taken off the IFR, she was on the bench.  Id. ¶ 89.  While it was Bailey's understanding that Human Resources and her coach were supposed to find her new work, Bailey also contacted partners to try to find a project.  D. 54 ¶¶ 210-11.  Human Resources Demand Manager Kristin Cheek tried to find projects for Bailey but had difficulty staffing her due to her limited range of skills and prior experience.[4]  D. 37 ¶¶ 5-7.  Between December 2012 and June 2013, Bailey scanned her key card at the Boston office only twice, but she came to the office with other employees (who scanned their key cards) at least forty times.  D. 54 ¶ 223.  Cheek contacted Bailey in late February to inquire about her work.  D. 53 ¶ 93.  Bailey responded that she would be on vacation for two weeks and unavailable until March 18, 2013.  Id.

In April 2013, Bailey was invited by PwC director Dharmaraj Khot to join a short-term tax advisory project.  Id. ¶¶ 94-95.  Bailey refused the offer because she considered herself unqualified.  Id. ¶ 95.  The project was scheduled to last only three to four weeks and Bailey did not think she would have time to learn the relevant financial concepts and perform the work in

---

[4] Bailey has moved to strike the portions of Cheek's declaration that address Cheek's efforts to find new engagements for Bailey, Cheek's characterization of Bailey's experience and skills as "limited," and her statement that the available engagements required skills that Bailey lacked.  D. 48.  Bailey has moved to strike these statements as conclusory and without foundation.  Id.  The motion to strike is denied.  The challenged statements are based upon Cheek's personal knowledge and experience as a PwC employee who was involved with helping Bailey look for new projects.  D. 37 ¶¶ 1-4.

that time.  Id.  The following month, Dillman spoke to Bailey about a potential engagement

involving document validation, but PwC was not retained for that engagement.  Id. ¶ 97.

>        D.        **Bailey's Unsatisfactory Performance Rating and Termination**

An IFR ARC met to discuss Bailey's performance on April 15, 2013.  Id. ¶¶ 102, 106.

The ARC rated Bailey a "5" or "Unsatisfactory," the lowest rating, because of her low billing

hours and the negative performance review from Angles.  Id. ¶ 106.  Dillman did not object to

that rating.  Id. ¶ 107.

On June 7, 2013, the ARC for the Capital Markets group met to assign performance

ratings for the year.  Id. ¶ 109.  Bailey had performed no work since the IFR ARC's rating two

months earlier, and the Capital Markets ARC finalized her "Unsatisfactory" rating.  Id.  Bailey's

employment with PwC was terminated on June 20, 2013.  Id. ¶ 110.  According to Dillman, the

decision to terminate Bailey was based 80% on her lack of work for over six months and 20% on

the negative performance review from Angles.  Id. ¶ 111.

>  **IV.        Procedural History**

Bailey instituted this action on January 20, 2014.  D. 1.  Defendants have now jointly

moved for summary judgment.  D. 33.  The Court heard the parties on the pending motion and

took the matter under advisement.  D. 68.

>  **V.        Discussion**

>        A.        **Retaliation**

To establish a prima facie case of retaliation claim under Title VII or Chapter 151B,

Bailey must show that:  1) she engaged in some protected activity; 2) suffered some material

adverse action by employer; and 3) the employer's adverse action was causally linked to her

protected activity.  Prescott v. Higgins, 538 F.3d 32, 43 (1st Cir. 2008); Mole v. Univ. of Mass.,

442 Mass. 582, 591-92 (2004).  Neither side disputes that Bailey engaged in protected conduct when she reported that Recor had been subjected to sexual advances by Angles and unjustified criticism of his work after he rejected the advances.  The disputed issue here is whether the evidence could support a finding that Bailey's termination was caused by such protected activity. Bailey claims that Angles retaliated against her for reporting Recor's allegations by giving her an unjustified negative performance review and getting her rolled off of the IFR project, which led directly to her termination.

### 1.    *There Is No Evidence Angles Knew of Bailey's Report*

The summary judgment record, however, after a full course of discovery, reveals gaps in the chain of causation between Bailey's protected activity and her termination that are fatal to her retaliation claims.  Bailey must show that Angles, the alleged retaliator, knew about her protected activity — "after all, one cannot have been motivated to retaliate by something he was unaware of."  Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013).  Despite Bailey's argument to the contrary, there is no evidence in the record from which a reasonable jury could conclude that Angles was aware that Bailey had reported Recor's harassment allegations to Dillman.  Without knowledge of Bailey's report, Angles could be found to have retaliated against her for such conduct.  See Domenichetti v. Premier Educ. Grp., LP, No. 12-cv-11311-IT, 2015 WL 58630, at *7 (D. Mass. Jan. 5, 2015) (holding that plaintiff's "retaliation claim fails because she is unable to demonstrate that any of the relevant decisionmakers knew about her protected conduct when they took the adverse employment actions").

First, Bailey argues that Angles learned of her report to Dillman from Peloquin.  Both Angles and Peloquin, however, deny that Peloquin told Angles.  Peloquin testified at his deposition that he honored a request from Human Resources not to discuss the matter with

anyone outside of Human Resources.  D. 36-3 at 15-16.  Angles testified that Peloquin did not tell him that he had spoken with Bailey regarding Recor's allegations.  D. 36-2 at 13-14.  Bailey argues that Peloquin must have shared this information with Angles because they "had been very close," had shared information in the past and gave "inconsistent" testimony as to whether they ever ate dinner alone together.  D. 52 at 8.  In fact, Peloquin and Angles testified consistently that they had work dinners with each other in group settings, but were not friends outside of work. D. 57-2 at 4-5; D. 57-3 at 3.  Bailey offers only unsupported speculation to support her theory that Peloquin and Angles spoke about her report.

Second, Bailey contends that her colleague Hurley informed Angles about Bailey's report to Dillman.  At her deposition, however, Bailey testified that Hurley promised Bailey that she would not talk to Angles.  D. 36-1 at 96.  Although Bailey believes that Hurley nonetheless told Angles about Recor's allegations, there is no evidence in the record that she did.  Bailey's supposition that Hurley did so because Angles worked from home the following week rather than reporting to Florida as usual, D. 54 ¶¶ 153-156, is, at most, speculative.

Finally, Bailey argues that Angles must have known about her report of Recor's allegations because he suddenly began to criticize her performance on October 15, 2012.  D. 52 at 14.  The evidence, however, reveals that Bailey had performance problems at PwC that were reported before October 2012.  For example, Bailey's work was criticized by her previous supervisor Tassone and the preparers Bailey supervised on her previous project, including Green and Salese.  D. 40 ¶¶ 7-13; D. 41 ¶¶ 7-9; D. 42 ¶¶ 9-13.  Before Bailey reported Recor's allegations to Dillman, Peloquin had assigned Bailey to Angles's team because of her poor performance.  D. 36-3 at 7-8.

2.   *There is No Evidence Peloquin's Decision to Remove Bailey from the IFR Project Was Retaliatory*

There is no evidence in the record upon which a reasonable jury could conclude that Peloquin removed Bailey from the IFR project for a retaliatory reason.  Even assuming that Angles knew of her report to Dillman and gave her a retaliatory negative review, Bailey has provided no evidence that Angles' alleged retaliatory motive can be attributed to Peloquin or that Peloquin's stated reason for removing her from the project was pretextual.

Peloquin testified that his decision to remove Bailey from the IFR project due to her poor performance was informed not only by Angles's evaluation of her work, but also by the negative feedback he received from approvers who reviewed Bailey's work.  D. 36-3 at 18-22.  After Peloquin assigned several of Bailey's files to Thai and four other approvers to review Bailey's work product, the approvers reported a range of issues with Bailey's files, including inconsistencies, typographical errors, incorrect answers, formatting problems and inattention to detail.  D. 36-18 at 2-3.  According to Bailey, "[n]one of the responses provided any criticisms of [her] work."  D. 54 ¶ 185.  Bailey attributed the errors in her files to poor directions from Angles, a problem with her computer or the fact that the files were old.  Id. ¶¶ 186-194.

Regardless of her actual performance, Bailey "must do more than cast doubt on the rationale proffered by [PwC;] the evidence must be of such strength and quality as to permit a reasonable finding that [her termination] was obviously or manifestly unsupported."  Shorette v. Rite Aid of Maine, 155 F.3d 8, 13 (1st Cir. 1998) (emphasis in original) (internal citation and quotation marks omitted).  "The question is not whether [Bailey] was actually performing below expectations, but whether [PwC] believed that she was."  Feliciano v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000).  Bailey has identified no specific admissible

evidence to support her position that PwC actually believed that her job performance was adequate yet nonetheless rolled her off the IFR project out of retaliatory animus.[5]

> 3.     *There Is No Evidence Connecting the Alleged Retaliation to a Material Adverse Employment Action*

Finally, Bailey has not presented evidence that the alleged retaliatory review led to a material adverse employment action.  Bailey does not argue that the poor performance review or her removal from the IFR project were actionable adverse employment actions.  Instead, she argues that her termination from PwC was a material adverse employment action "derived entirely from the retaliatory negative evaluation prepared by Mr. Angles." D. 52 at 18.  Bailey, however, has pointed to no evidence to support her theory that the negative performance review prepared by Angles led to her termination.

Bailey must show that the alleged retaliation was the but-for cause of her termination, Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014), and she has failed to do so.  It is undisputed that Bailey was terminated as a result of an unsatisfactory rating from the Capital Markets group ARC.  There is no evidence in the record that any of the ARC decisionmakers, aside from Dillman, knew of either Bailey's report to Dillman or the underlying allegations by Recor.  It is undisputed that Bailey did no billable work from the time she was rolled off the IFR engagement at the end of November 2012 through her performance assessment in April 2013. D. 53 ¶ 101.  Dillman testified without contradiction that Bailey's "inability to secure work and employment was the dominant reason why she was severed."  D. 36-4 at 22.  Furthermore,

---

[5] Relatedly, Bailey has moved to strike all references to errors in her IFR files on the basis that the files themselves were not produced and therefore any reference to the errors is without foundation.  D. 55.  Bailey similarly has also moved to strike various exhibits that address the review of IFR files.  D. 56.  The motions are denied.  Testimony about the problems with Bailey's performance that were reported to Peloquin would be admissible and relevant because it is probative of Peloquin's good faith belief that Bailey was not performing adequately.

Bailey attributes no discriminatory or retaliatory motive to Dillman and cannot identify any other members of the ARC.  D. 53 ¶ 107; D. 36-1 at 130.  To the extent that the Angles review played a role in the ARC's decision, Dillman's unrebutted testimony is that "[o]ne [performance review] does not, you know, ruin – quote unquote ruin somebody," and "80 percent of the [termination] determination was her inability to find employment and perhaps 20 percent" the negative performance review from Angles.  D. 36-4 at 23-24.  No reasonable jury could conclude that Bailey's protected activity was the but-for cause of her termination from PwC.  See Mole, 442 Mass. at 598 (noting that "[d]espite a retaliatory or discriminatory motive on the part of a supervisor who recommends that some adverse action be taken against an employee, a third person's independent decision to take adverse action breaks the causal connection between the supervisor's retaliatory or discriminatory animus and the adverse action").

**B.    Age Discrimination**

The ADEA and Massachusetts law make it unlawful for an employer to take an adverse employment action against an employee on the basis of age.  29 U.S.C. § 623(a); Mass. Gen. L. c. 151B § 4.  Under the burden-shifting framework for discrimination cases under federal and state law, Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008), a plaintiff must make a prima facie by showing that 1) the plaintiff was at least 40 years old; 2) the plaintiff's job performance met the employer's legitimate expectations; 3) plaintiff suffered an adverse employment action; and 4) employer filled his/her position with another.  See Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014); Dunn v. Trustees of Boston Univ., 761 F.3d 63, 68 (1st Cir. 2014).  If plaintiff makes out a prima facie case, then the burden shifts to the employer to "articulate a legitimate, non discriminatory reason for its decisions."  Adamson, 750 F.3d at 78 (internal quotations and citation omitted).  "If the employer meets this burden, the

focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." Id. (internal quotations and citation omitted).

For the reasons discussed above in regard to her job performance, it is not clear that Bailey has established a prima facie claim of age discrimination, particularly in regard to whether her job performance met her employer's legitimate expectations. Assuming *arguendo* that she has made this showing, PwC has articulated a legitimate, non-discriminatory reason for its termination of her employment, namely that her job performance, as evaluated by several reviewers and managers, and lack of billing, and as ultimately determined by the ARC, was the basis of her termination. Bailey has failed to rebut this showing and show that these reasons are pretextual. Bailey makes several arguments that the reasons are pretextual. First, Bailey testified that she thought that PwC favored younger employees because they were smarter, D. 36-1 at 124-25, but her belief regarding same does not raise a reasonable inference of discrimination. Second, Bailey described one occasion in November 2012 when Peloquin asked her if she would not rather be home with her grandchildren and if she were not getting "a little too old" to be "traveling and doing what [she] was doing." Id. at 125-26. Bailey responded that she enjoyed the work and the travel, and the conversation ended. Id. at 126. Isolated questions or stray remarks from a supervisor, particularly one who did not make the ultimate, adverse decision regarding termination, about retirement plans do not on their own constitute evidence of age bias. See Shorette, 155 F.3d at 13 (noting that asking plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing"); see Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 n.8 (1st Cir. 1998) (observing that "stray

remarks in the workplace . . . , statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are generally insufficient to prove discriminatory animus) (internal citation and quotation marks omitted).  Finally, Bailey stated that three other employees between the ages of forty and seventy left PwC, but the record offers nothing about the relevance of their departures (i.e., circumstances of departure, job performance) to Bailey's claim.  D. 36-1 at 127-28.  Accordingly, having failed to show that the stated reasons for her termination were pretext for age discrimination, Bailey's discrimination claims must also fail.

## VI.   Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 33, and DENIES Bailey's motions to strike, D. 48, D. 49, D. 50, D. 51, D. 55, D. 56.  Defendants' motions to strike portions of Bailey's and Aries's affidavits are DENIED as moot, D. 66, D. 67.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge